## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **FEDERAL TRADE COMMISSION and** **STATE OF FLORIDA,** <br><br>       **Plaintiffs,** <br><br>       **v.** <br><br> **STUDENT AID CENTER, INC., a corporation,** <br><br> **RAMIRO FERNANDEZ-MORIS, a/k/a RAMIRO MORIS, individually and as an officer or director of STUDENT AID CENTER, INC., and** <br><br> **DAMIEN ALVAREZ, individually and as an officer or director of STUDENT AID CENTER, INC.** <br><br>       **Defendants.** | **Civil Action No. _____** |

### COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiffs, the Federal Trade Commission (FTC) and State of Florida (collectively Plaintiffs), for their Complaint allege:

1. The FTC brings this action under Section 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. §53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act (Telemarketing Act), l5 U.S.C. §§ 6101-6108, to obtain preliminary and permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Telemarketing

1

Sales Rule (TSR), 16 C.F.R. Part 310, in connection with the marketing and sale of debt relief services.

2.      The State of Florida, by and through its Attorney General, Pamela Jo Bondi, brings this action pursuant to the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Chapter 501, Part II, Florida Statutes (2015); the Telemarketing Act, 15 U.S.C. §§ 6101-6108; and the TSR, 16 C.F.R. Part 310, to obtain preliminary and permanent injunctions, rescission or reformation of contracts, consumer restitution, disgorgement of ill-gotten monies, civil penalties and other equitable relief, and reimbursement of costs and attorneys' fees for Defendants' acts or practices in violation of the FDUTPA. The State of Florida has conducted an investigation, and the head of the enforcing authority, Attorney General Pamela Jo Bondi, has determined that an enforcement action serves the public interest.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(a), 6103(a), and 6105(b).

4.      This Court has supplemental jurisdiction over the State of Florida's claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this district under 28 U.S.C. § 1391(b)(1), (c)(1)-(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

6.      The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC is also charged with enforcement of the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  Pursuant to the

Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

7.      The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 6102(c), and 6105(b).

8.      The State of Florida is the enforcing authority under FDUTPA pursuant to Florida Statutes § 501.203(2) and is authorized to pursue this action to enjoin violations of FDUTPA and to obtain equitable or other appropriate relief including rescission or reformation of contracts, restitution, the refund of monies paid, civil penalties, disgorgement of ill-gotten monies, or other relief as may be appropriate. Fla. Stat. §§501.207, 501.2075, and 501.2077. Pursuant to the authority found in the Telemarketing Act at 15 U.S.C. § 6103(a), the State of Florida is also authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of Florida residents.

**DEFENDANTS**

9.      Defendant Student Aid Center, Inc. (SAC) is a Florida corporation with its principal place of business at 2500 Northwest 79th Avenue, Suite 190, Doral, Florida 33122. Student Aid Center transacts or has transacted business in this district and throughout the United States. Student Aid Center was incorporated in 2013. At times material to this Complaint, acting alone or in concert with others, Student Aid Center has advertised, marketed, promoted, offered for sale, or sold student loan debt relief services to consumers throughout the United States.

3

10.     Defendant Ramiro Fernandez-Moris, also known as Ramiro Moris, is a president of Student Aid Center. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Student Aid Center, including the acts and practices set forth in this Complaint. Defendant Fernandez-Moris resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

11.     Defendant Damien Alvarez is also a president of Student Aid Center. At times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Student Aid Center, including the acts and practices set forth in this Complaint. Defendant Alvarez resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

**COMMERCE**

12.     At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44 and as "trade or commerce" is defined in Florida Statutes Section 501.203(8).

**DEFENDANTS' DECEPTIVE STUDENT LOAN DEBT RELIEF OPERATION**

13.     Since at least April 2013 through September 2015, Defendants operated an unlawful debt relief enterprise that preyed on consumers' anxiety about student loan debt by falsely promising to reduce or eliminate that debt. Defendants marketed their services through inbound telemarketing calls from consumers responding to Defendants' Internet, social media, radio advertising, and through outbound telemarketing calls to consumers who responded to

4

Defendants' websites. Defendants' websites enticed consumers with promises like "Get Your Student Loans Forgiven Now!" and "$17,500 in Up Front Forgiveness?" When consumers called for more information, Defendants told them that they were "approved" or "pre-approved" for student loan forgiveness or reduced monthly payments.

14.    Defendants then claimed consumers could receive the loan forgiveness or modification if they paid upfront fees, typically five monthly installments of $199 or more. In fact, government loan forgiveness programs, for which consumers can apply at no cost, have strict requirements that most of Defendants' customers were not likely to meet.

**Background on Student Loan Debt and Forgiveness Programs**

15.    Student loan debt is the second largest class of consumer debt after mortgages; more than 41 million Americans collectively owe over $1.2 trillion in student loan debt. The student loan market continues to show elevated levels of distress relative to other types of consumer debt.

16.    To address this mounting level of distressed debt, the U.S. Department of Education (ED) and state government agencies administer a limited number of student loan forgiveness, discharge, income-based repayment, and incentive repayment programs. Consumers can apply for forgiveness, discharge, or incentive payment programs on their own at no cost; these programs do not require the assistance of a third-party company or payment of upfront fees.

17.    Most consumers, however, do not qualify for these forgiveness, discharge, income-based repayment, and incentive repayment programs. None of ED's programs are available for private student loans, and many are only available for certain types of recent federal student loans.

18.     For example, under Public Service Loan Forgiveness (PSLF), ED provides full loan forgiveness for consumers holding eligible federal "Direct Loans" (those made by ED as the lender and not merely the guarantor) who have made 120 monthly payments while employed in public service. This program, however, only applies to certain loan payments made after October 1, 2007. As a result, there have been no loans forgiven yet under PSLF.

19.     Other forgiveness, discharge, income-based repayment, and incentive repayment programs also have strict eligibility requirements, such as demonstrating a "total and permanent disability" (ED's "Total and Permanent Disability Discharge") or demonstrating that the loan was falsely certified because of identity theft (ED's "False Certification of Student Eligibility Discharge"). Many forgiveness, discharge, income-based, and incentive repayment programs require working in certain professions for years, such as ED's "Teacher Loan Forgiveness," which can provide up to $17,500 for teachers who have worked full-time for five years in a low-income elementary or secondary school or educational service agency.

20.     Similar eligibility restrictions apply to programs administered by state government agencies.

### Defendants' Websites and Online Advertising

21.     Before August 2015, Defendants maintained several websites to promote their student loan debt relief services, including *studentaidcenter.org* and *studentloanforgiveness plans.org*. Defendants' websites appeared at or among the top of Internet search results when consumers searched for "student loan forgiveness." For example, Defendants' *studentloanforgivenessplans.org* website appeared as a sponsored search result on Google and included a hyperlink titled "Obama Loan Forgiveness," in which Defendants claimed to provide

"Quick Qualification" and "Fast Easy Approval." Further, Defendants stated consumers can "Qualify for Zero Payment," and "Get Your Student Loan Forgiven Now":



(Google search results captured in July 2015)

22.     Defendants' *studentaidcenter.org* website similarly referred to an "Obama Student Loan Forgiveness Program" and instructed consumers to "Take Advantage of New Federal Programs." Defendants' website urged consumers to "Take Action & Get Your Student Loans Forgiven" and claimed consumers could be "Approved in Minutes":



(*www.studentaidcenter.org*; website captured on October 8, 2014).

The *studentloanforgivenessplans.org* website made almost identical misrepresentations.

23.     Defendants' websites emphasized their purported ability to provide consumers quick student loan forgiveness. The *studentaidcenter.org* website included slogans like "Get Rid of Student Loan Debt" and "Get Your Student Loans Forgiven Now!" The website also stated that Student Aid Center had "aid counselors available now," offered "Student Loan Forgiveness Plans," and claimed that Student Aid Center could "Solve Student Loan Issues!" Defendants advertised "Fast Approval," telling consumers they could "Save Time & Money" and achieve "Expert Rapid Results!":



(*www.studentaidcenter.org*; website captured on October 8, 2014)

24.     Defendants' *studentaidcenter.org* website sought to instill urgency in consumers. It warned consumers "Don[']t wait until your situation spirals even further out of control," and invited consumers to "Join thousands of people who have already saved money" and have "Received Student Loan Forgiveness" and have "dramatically improved their credit rating and score!":



(*www.studentaidcenter.org*; website captured on October 8, 2014)

### *Other Methods of Advertising*

25.     Defendants also advertised on social media sites, on the radio, and by text messaging. For example, SAC advertised on Instagram, using an image of an aerial banner ad touting student loan forgiveness:



(Instagram screen capture made November 17, 2015)

26.    Defendants' radio advertisements claimed they could help "lower your monthly payment and forgive your student loans" and "help you kiss your student-loan debt goodbye."

27.    Defendants also advertised their services using "text blasts" to consumers nationwide. Defendants sent text messages suggesting that consumers' loans could be instantly approved for forgiveness: "Student Loan Forgiveness Programs Available-Enroll Now Open-No Credit Check-CALL NOW-Instant Approval-855-801-6739 StudentAidCenter.org Rply STOP to

stop." Other messages stated that consumers' loans had already been approved for loan forgiveness.

### *Defendants' Telemarketing Sales Pitch*

28.     Defendants' telemarketers pitched their student loan debt relief services to consumers who called after seeing Defendants' websites or social media advertisements, hearing radio advertisements, or receiving text messages. Defendants also made outbound calls to consumers who submitted their contact information through Defendants' websites.

29.     Defendants' telemarketers initially told consumers they were "approved" or "pre-approved" for student loan forgiveness or reduced monthly payments. Defendants' telemarketers lured consumers into signing up for Student Aid Center's debt relief program by promising consumers that their student loan payments would be permanently reduced to a lower amount, often $0. In many such instances, consumers were facially ineligible for immediate loan forgiveness.

30.     In telephone sales presentations, Defendants told consumers that they could receive loan forgiveness or modification for consumers' student loan debt if they paid upfront fees. Defendants' upfront fees typically consisted of three to five monthly installments of $199 or more. Defendants' telemarketers sometimes misrepresented who received these upfront fees, leading consumers to believe that some or all of the fees paid to Student Aid Center would go towards consumers' student loans. In other instances, Defendants claimed the upfront fees were required to demonstrate the consumers' ability to pay the new reduced monthly amount Defendants' telemarketers promised. To induce consumers to pay the advanced fees, Defendants' telemarketers claimed that the student loan debt relief was guaranteed and, if

Defendants were unable to secure the promised debt relief, they would refund fees charged to consumers.

31.     In numerous instances, Defendants falsely suggested that Student Aid Center was involved in the student loan forgiveness or modification approval process. For example, Defendants told or implied to consumers that Defendants were affiliated with the consumers' lenders or ED or had a strong and unique relationship with the consumers' lender or ED. Neither claim was true. In fact, Defendants were not authorized to, and therefore could not, approve or pre-approve consumers for student loan forgiveness or lower monthly payments because these determinations are made only by ED.

32.     Defendants often failed to adequately disclose material aspects of the loan repayment plans that they pitched to consumers. Specifically, Defendants placed consumers loans in forbearance, often without their knowledge or consent, while consumers made monthly payments to SAC. Defendants also failed to disclose that interest on consumers' loans continued to accrue while in forbearance, increasing consumers' financial obligations in many instances.

33.     Further, in numerous instances, Defendants told consumers not to contact their lenders or ED. Defendants claimed that they would handle all communications with consumers' lenders or ED. Defendants told consumers that Student Aid Center would be like their attorney and would speak with their lenders and loan servicers. In some instances, Defendants also advised consumers to stop paying their lenders and to instead make the required monthly payments to Student Aid Center.

34.     Defendants typically required consumers to electronically sign a contract containing language directly contradicting what Defendants represented to consumers when inducing them to sign up for Student Aid Center's services. For example, while Defendants

frequently told consumers to stop paying their lenders and instead pay Student Aid Center, Student Aid Center's contract directed consumers to continue paying their lenders. Consumers reported Defendants pressured them into quickly electronically signing the contract while Defendants purported to explain the contract.

35.     Consumers frequently did not receive the services Defendants promised. In numerous instances, Defendants represented to consumers that some or all of their loans would be forgiven. In reality, however, Defendants had no ability to authorize or approve student loan forgiveness, and most consumers did not receive loan forgiveness or have their monthly payments reduced to $0.

36.     While Defendants told consumers they were entitled to a 100% money-back guarantee, consumers encountered difficulty requesting and obtaining refunds from Student Aid Center. Often, when consumers requested a refund, Defendants did not provide any refund or they refunded an amount substantially less than what consumers paid. Some consumers obtained a refund only after complaining to the Better Business Bureau or to a state or federal regulatory authority. Further, dissatisfied consumers complained that, rather than issuing refunds after they canceled their enrollment, Defendants threatened to send consumers' accounts to collection in order to collect the unpaid portion of Defendants' fees.

37.      Defendants have deprived thousands of consumers nationwide of millions of dollars.

## THE FTC ACT

38.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

39.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## VIOLATIONS OF THE FTC ACT

### COUNT I (by Plaintiff FTC)
### False or Unsubstantiated Representations

40.     In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of student loan debt relief services, Defendants have represented, directly or indirectly, expressly or by implication:

      a.   The amount of money consumers generally would save by using Defendants' service;

      b.   That Defendants were affiliated or associated with any federal student loan forgiveness or student loan modification program;

      c.   That a consumer was preapproved or approved for student loan forgiveness or student loan modification;

      d.   That any reduction in a consumer's monthly payments would be permanent;

      e.   That some or all of a consumer's monthly payments to Student Aid Center were forwarded to the lender; and

      f.   That consumers are entitled to a 100% money-back guarantee.

41.     In truth and in fact, in numerous instances in which Defendants have made the representations set forth in Paragraph 40, such representations were false or not substantiated at the time the representations were made.

42.     Therefore, Defendants' representations as set forth in Paragraph 40 were false and misleading and constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## THE TELEMARKETING SALES RULE

43.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108, in 1994. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter.

44.     Defendants are "seller[s]" or "telemarketer[s]" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

45.     Defendants are sellers or telemarketers of "debt relief services" as  defined by the TSR, 16 C.F.R. § 310.2(o). Under the TSR, a "debt relief service" means any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor. 16 C.F.R. § 310.2(o).

46.     The TSR prohibits sellers and telemarketers from requesting or receiving payment of any fees or consideration for any debt relief service until and unless:

  a.  The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

  b.  The customer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor; and

    c.   To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either:

        1.   Bears the same proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount. The individual debt amount and the entire debt amount are those owed at the time the debt was enrolled in the service; or

        2.   Is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration. The percentage charged cannot change from one individual debt to another. The amount saved is the difference between the amount owed at the time the debt was enrolled in the service and the amount actually paid to satisfy the debt. 16 C.F.R. § 310.4(a)(5)(i).

47.    The TSR prohibits sellers and telemarketers from misrepresenting directly or by implication, any material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using the service. 16 C.F.R. § 310.3(a)(2)(x).

48.    In connection with the sale of debt relief services, the TSR prohibits sellers and telemarketers from failing to disclose truthfully in a clear and conspicuous manner, before a customer consents to pay, if any aspect of the debt relief service relies upon or results in the customer's failure to make timely payments to creditors or debt collectors, that the use of the debt relief service will likely adversely affect the customer's creditworthiness, may result in the customer being subject to collections or sued by creditors or debt collectors, and may increase

17

the amount of money the customer owes due to the accrual of fees and interest, 16 C.F.R. § 310.3(a)(1)(viii)(C).

49.     Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. 15 § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

50.     Florida Statutes § 501.203(3) establishes that a violation of FDUTPA may be based upon any of the following: (a) any rules promulgated pursuant to the FTC Act; (b) the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts; or (c) any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

### VIOLATIONS OF THE TELEMARKETING SALES RULE

**COUNT II (by Plaintiffs FTC and State of Florida)**
**Advance Fee for Debt Relief Services**

51.     In numerous instances, on or after October 27, 2010, in connection with the telemarketing of student loan debt relief services, Defendants requested or received payment of a fee or consideration for debt relief services before:

     a.  Defendants had renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

     b.  the customer had made at least one payment pursuant to that agreement.

52.     Defendants' act or practice, as described in Paragraph 51 of this Complaint, was an abusive telemarketing act or practice that violates Section 310.4(a)(5)(i) of the TSR, 16 C.F.R. § 310.4(a)(5)(i).

53.     Pursuant to Section 6103(a) of the Telemarketing and Consumer Fraud Abuse Prevention Act, 15 U.S.C. § 6103(a), an attorney general for any State may bring a civil action to enjoin violations of the TSR, to enforce compliance with the TSR and to obtain damages, restitution, or other compensation on behalf of residents or to obtain such further and other relief as the court may deem appropriate.

54.     Therefore, Defendants' failure to comply with the TSR, as set forth above, constitutes a per se violation of FDUTPA.

## COUNT III (by Plaintiffs FTC and the State of Florida)
### Misrepresentations

55.      In numerous instances, in connection with the telemarketing of student loan debt relief services, Defendants misrepresented, directly or indirectly, expressly or by implication, material aspects of their debt relief services, including, but not limited to:

    a.  The amount of money consumers generally would save by using Defendants' service;

    b.  That Defendants were affiliated or associated with any federal student loan forgiveness or student loan modification program;

    c.  That a consumer was preapproved or approved for student loan forgiveness or student loan modification;

    d.  That any reduction in a consumer's monthly payments would be permanent;

    e.  That some or all of a consumer's monthly payments to Student Aid Center would be forwarded to the lender; and

      f.   That consumers were entitled to a 100% money-back guarantee.

56.    Defendants' acts and practices, as described in Paragraph 55 of this Complaint, were deceptive telemarketing acts or practices that violate Section 310.3(a)(2)(x) of the TSR, 16 C.F.R. § 310.3(a)(2)(x).

57.    Pursuant to Section 6103(a) of the Telemarketing and Consumer Fraud Abuse Prevention Act, 15 U.S.C. § 6103(a), an attorney general for any State may bring a civil action to enjoin violations of the TSR, to enforce compliance with the TSR and to obtain damages, restitution, or other compensation on behalf of residents or to obtain such further and other relief as the court may deem appropriate.

58.    Therefore, Defendants' failure to comply with the TSR, as set forth above, constitutes a per se violation of FDUTPA.

## COUNT IV (by Plaintiff FTC)
## Failure to Disclose Material Facts

59.    In numerous instances, in connection with the telemarketing of student loan debt relief services that relied upon or resulted in the customer's failure to make timely payments to creditors, Defendants failed to disclose truthfully, in a clear and conspicuous manner, before a consumer consented to pay, that the use of the debt relief service may increase the amount of money the customer owed due to the accrual of fees and interest.

60.    Defendants' act or practice, as described in Paragraph 59 of this Complaint, was a deceptive telemarketing act or practice that violates Section 310.3(a)(1)(viii)(C) of the TSR. 16 C.F.R. § 310.3(a)(1)(viii)(C).

## VIOLATIONS OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT

### COUNT V (by State of Florida)
### Deceptive Debt Relief Services Representations

61.     As set forth in Paragraphs 1 through 37 and 43 through 50 above, which allegations are incorporated as if set forth herein, Defendants have committed acts and practices that are deceptive or unfair in violation of the FDUTPA.

62.     Florida Statutes §501.204(1) declares "unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

63.     In the course of Defendants' trade or commerce, Defendants have committed acts or practices that are deceptive or unfair in violation of the FDUTPA including making false or misleading representations, directly or indirectly, expressly or by implication, in connection with the marketing, promotion, offering for sale, sale, or performance of student loan debt relief services, including, but not limited to:

   a.  The amount of money consumers generally would save by using Defendants' service;

   b.  That Defendants were affiliated or associated with any federal student loan forgiveness or student loan modification program;

   c.  That a consumer was preapproved or approved for student loan forgiveness or student loan modification;

   d.  That any reduction in a consumer's monthly payments would be permanent;

   e.  That some or all of a consumer's monthly payments to Student Aid Center would be forwarded to the lender; and

   f.  That consumers were entitled to a 100% money-back guarantee.

21

64.     In truth and in fact, in numerous instances, such representations were false or misleading or not substantiated at the time the representations were made.

65.     Defendants Ramiro Fernandez-Moris and Damien Alvarez are personally liable for the unlawful acts and practices of Defendant Student Aid Center, as they each have the authority and power to control or direct the conduct at issue herein and/or actually participated in and directed the conduct at issue.

66.     The acts and practices of the Defendants as set forth herein were misleading or deceptive and likely to mislead a consumer acting reasonably, and consumers within the State of Florida and elsewhere were actually misled by the acts and practices of the Defendants recited herein.

### COUNT VI (by State of Florida)

### Unlawful Fees and Costs for Debt Management and/or Credit Counseling Services

67.     Plaintiff State of Florida Office of the Attorney General re-alleges Paragraphs 1 through 37 and 43 through 50 and incorporates them herein by reference.

68.     Florida Statute § 817.801(2) defines "credit counseling services" as "confidential money management, debt reduction, and financial educational services."

69.     Florida Statute § 817.801(4)(a) defines "debt management services" as "services provided to a debtor by a credit counseling organization for a fee to: (a) effect the adjustment, compromise, or discharge of any unsecured account, note, or other indebtedness of the debtor..."

70.     Defendants represented to consumers on their websites that Student Aid Center could qualify consumers for student loan forgiveness and/or student loan consolidation, lower their monthly payments, obtain lower rates and terms, save time and money with expert rapid results, and dramatically improve their credit rating and score. Defendants' telemarketers also

represented to consumers that Student Aid Center could qualify/approve/pre-approve consumers for lower monthly payments, student loan forgiveness and/or student loan consolidation.

71.    Further, Defendants required consumers to sign a Limited Durable Power of Attorney in which the consumer was authorizing Student Aid Center to: "communicate with any and all of my Federal Student Loan providers to consolidate, restructure or refinance or enter into any forbearance agreement regarding my Student Loans; to communicate with banks, creditors, financial institutions, licensed collection agencies, and all other related entities and individuals relating to my Federal Student Loans." The Limited Durable Power of Attorney also required consumers to, "authorize third party communications from banks, creditors, financial institutions, licensed collection agencies, and all other related entitites and individuals relating to my Federal Student Loans to communicate directly with Student Aid Center, Inc. concerning my account or the collection activities associated with it, in accordance with Section 805(b) of the Fair Debt Collection Practices Act. I further request that all of my lenders direct all further telephone calls … and correspondence directly to Student Aid Center, Inc… Any and all communications directed to me will be referred to Student Aid Center, Inc., and only Student Aid Center, Inc. will be authorized to deal with your company and/or its' representatives."

72.    Moreover, Defendants' Student Loan Service Agreement, which Defendants required consumers to electronically sign provides, "the Client hereby engages SAC for the following services: a) to conduct a financial analysis of the Client's current financial circumstances b) to discuss with the Client the various options that may be available to the Client regarding their outstanding student loan(s), c) to assist the Client in preparing all the paperwork necessary to enroll and/or apply for a loan consolidation or repayment program that benefits the

Client d) once applied, make calls, follow up and continue submitting any and all paperwork necessary to garner approval for the Client."

73.     Defendants' Student Loan Service Agreement states, "SAC must obtain a loan consolidation and/or repayment program or loan forgiveness for the Client and the program obtained must provide a financial benefit to the Client (i.e. either a lower monthly payment, lower interest rate, a shorter term, or loan forgiveness) or the Client is entitled to be reimbursed 100% of any fees that SAC has charged the Client."

74.     Defendants are therefore engaged in credit counseling services and/or debt management services as defined by Florida Statute § 817.801(2) and (4)(a).

75.     Florida law limits the fees that a person may charge while engaging in debt management services or credit counseling services. Pursuant to Florida Statute § 817.802(1), "it is unlawful for any person, while engaging in debt management services or credit counseling services, to charge or accept from a debtor residing in this state, directly or indirectly, a fee or contribution greater than $50 for the initial setup or initial consultation. Subsequently, the person may not charge or accept a fee or contribution from a debtor residing in this state greater than $120 per year for additional consultations…"

76.     Defendants routinely charged Florida consumers unlawful fees and costs in violation of Florida Statute § 817.802(1). Typically Defendants charged consumers 3-5 monthly payments of between $99-$299 per month.

77.     A violation of Florida Statute § 817.802(1) is an unfair or deceptive trade practice. Pursuant to Florida Statute § 817.806(1), "any person who violates any provision of this part commits an unfair or deceptive trade practice as defined in part II of chapter 501. Violators shall be subject to the penalties and remedies provided therein. Further, any consumer injured by

a violation of this part may bring an action for recovery of damages. Judgment shall be entered for actual damages, but in no case less than the amount paid by the consumer to the credit counseling agency, plus reasonable attorney's fees and costs."

78.     Defendants Ramiro Fernandez-Moris and Damien Alvarez are personally liable for the unlawful acts and practices of Defendant Student Aid Center, as they each have the authority and power to control or direct the conduct at issue herein and/or actually participated in and directed the conduct at issue.

79.     Florida Statute Section 501.203(3) establishes that a violation of FDUTPA may be based upon any of the following: (a) any rules promulgated pursuant to the Federal Trade Commission Act; (b) the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts; or (c) any law, statute, rule, regulation or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices.

80.     Therefore, Defendants unlawful fees and costs under Florida Statute Section 817.802(1), as set forth above, constitute per se violations of FDUTPA.

### CONSUMER INJURY

81.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, TSR, and FDUTPA. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

82.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

83.     Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and Telemarketing Act, including the rescission or reformation of contracts and the refund of money.

84.     Pursuant to 28 U.S.C § 1367, this Court has supplemental jurisdiction to allow Plaintiffs State of Florida, to enforce their state law claims against Defendants in this Court for violations of the FDUTPA. Florida Statutes §§ 501.207, 501.2075, and 501.2077 authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violation of the FDUTPA, including injunctive relief, rescission or reformation of contracts, the refund of monies paid, the disgorgement of ill-gotten monies, and civil penalties.

## PRAYER FOR RELIEF

85.     Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, and Plaintiff State of Florida, pursuant to Florida Statutes §§ 501.207,

501.2075, and 501.2077, and as authorized by the Court's own equitable powers, request that the Court:

    A.     Award Plaintiffs such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including but not limited to, preliminary injunctions;

    B.     Enter a permanent injunction to prevent future violations of the FTC Act, the TSR, and the FDUTPA by Defendants;

    C.     Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act, the TSR, and the FDUTPA, including but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies;

    D.     Award civil penalties in an amount up to $10,000.00 per transaction pursuant to Florida Statutes § 501.2075 and up to $15,000.00 per transaction pursuant to Florida Statutes § 501.2077, for the willful acts and practices of the Defendants in violation of the FDUTPA; and

    E.     Award Plaintiffs the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated: May 23, 2016

Respectfully submitted,

DAVID C. SHONKA
Acting General Counsel

_____
REID TEPFER
Texas Bar No. 24079444
JAMES GOLDER
Texas Bar No. 08089520

AARON HABERMAN
Texas Bar No. 24092468

Federal Trade Commission
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
(214) 979-9395; rtepfer@ftc.gov
(214) 979-9376; jgolder@ftc.gov
(214) 979-9381; ahaberman@ftc.gov
(214) 953-3079 (fax)

**Attorneys for Plaintiff**
**FEDERAL TRADE COMMISSION**


PAMELA JO BONDI
Attorney General for the State of Florida


RYANN FLACK
Florida Bar No. 0018442
DIANE OATES
Florida Bar No. 116233
Assistant Attorneys General

Office of the Attorney General
Consumer Protection Division
444 Brickell Avenue, Suite 650
Miami, Florida 33131
Flack Tel: (305) 377-5850 ext. 562
Ryann.Flack@myfloridalegal.com
Oates Tel: (305) 377-5850 x 561
Diane.Oates@myfloridalegal.com

**Attorneys for Plaintiff**
**STATE OF FLORIDA**